Electronically Filed
Supreme Court
SCWC-12-0000383
18-MAY-2016
07:46 AM

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---o0o---

BRIAN YOSHII,
Petitioner/Claimant-Appellee-Appellant

vs.

STATE OF HAWAIʻI, UNIVERSITY OF HAWAIʻI,
Respondent/Employer-Appellant/Appellee, Self-Insured,

and

FIRST INSURANCE COMPANY OF HAWAIʻI, LTD.,
Respondent/Third-Party Administrator-Appellant-Appellee.

SCWC-12-0000383

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-12-0000383; CASE NO. AB 2010-169 (2-08-46774))

MAY 18, 2016

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY RECKTENWALD, C.J.

Brian Yoshii, a State of Hawaiʻi employee, was injured while he was working for the University of Hawaiʻi (UH) Leeward Community College (LCC). This appeal concerns Yoshii's

subsequent workers' compensation claim made against the State and its insurance carrier, First Insurance Company of Hawaiʻi, Ltd.

Yoshii was involved in an accident on the LCC premises approximately one hour after he ended work for the day. An MRI of Yoshii's knee revealed that he had torn his meniscus. Yoshii's employer, UH, and its insurance carrier, First Insurance (collectively "the State") denied Yoshii's claim for compensation on the basis that his injury was not work-related.

Yoshii argues that pursuant to Hawaiʻi Revised Statutes (HRS) § 386-85,[1] the Labor and Industrial Relations Appeals Board (LIRAB) was required to presume that Yoshii's knee injury was work-related in the absence of substantial evidence to the contrary. The LIRAB concluded that the State had adduced substantial evidence sufficient to overcome the presumption that Yoshii's knee injury was a covered work-related injury. The Intermediate Court of Appeals affirmed the LIRAB's decision and order.

The issues in this case are very similar to our recent decision in Panoke v. Reef Dev., in which we held that "[t]he LIRAB erred in concluding that [Employer] adduced substantial evidence sufficient to overcome the presumption that Panoke's

---

[1] HRS § 386-85 (1984) provides, in pertinent part, that "[i]n any proceeding for the enforcement of a claim for compensation under this chapter it shall be presumed, in the absence of substantial evidence to the contrary: (1) That the claim is for a covered work injury."

shoulder injuries were related to his . . . work accident" and remanded to the LIRAB for further proceedings. 136 Hawaiʻi 448, 468, 363 P.3d 296, 316 (2015). Similarly, we hold here that the LIRAB erred in concluding that the State rebutted the presumption that Yoshii suffered a compensable work injury. We therefore vacate the ICA's judgment and the LIRAB's decision and order, and remand to the LIRAB for further proceedings consistent with this opinion.

## I.  Background

### A.  Yoshii's work history and October 2008 leg injury

Yoshii began working for Respondent/Employer-Appellant-Appellee UH's LCC on August 1, 1995 as a "Cook II," and was still employed in that position on the date of his alleged work-related injury on October 30, 2008. Yoshii's job involved spending all day walking and standing on his feet, and going up and down stairs to get pots, pans, and kitchen utensils. Yoshii's work schedule in this position was Monday through Friday, 6:00 a.m. to 2:30 p.m.

On January 3, 2008, Yoshii's primary treating physician, Dr. Luis J. Ragunton, treated Yoshii for "mild leg edema" which Dr. Ragunton noted "maybe [sic] accounting for some of [Yoshii's] leg pain." On October 27, 2008, Dr. Ragunton's report stated that he treated Yoshii for "pain in the right leg," which Yoshii stated occurred "shortly after getting off the chair

after watching a movie" the day before, on October 26. Yoshii later testified that the pain on this occasion was in his calf. Dr. Ragunton proposed treating the edema with furosemide tablets, a diuretic, to reduce swelling.

Dr. Ragunton's report regarding the October 27th visit does not indicate that Yoshii was told to stay home from work, but Yoshii testified that Dr. Ragunton told him to stay home for two days, raise his leg, and stay off his feet. Yoshii also testified that he stayed home for two days because "the pain was intolerable."

Yoshii testified that he returned to work on October 30, 2008 and worked his full shift from 6:00 a.m. to 2:30 p.m. Yoshii also stated that his leg felt better than it had during the prior few days. After Yoshii finished work, as he was leaving the premises and walking down some stairs on the loading dock, he "planted [his] right foot, [and] there was a really sharp pain." On the WC-5 form Yoshii submitted when making his claim for compensation, Yoshii recorded that this incident happened at 3:30 p.m. The State's WC-1 "report of industrial injury" form also recorded the time of the injury as 3:30 p.m. At trial, Yoshii confirmed that the injury occurred after his shift was over.

Yoshii stated that the pain he experienced while walking down the stairs on October 30, 2008 was "[n]o comparison"

to the pain he experienced the prior Sunday, when he hurt his leg standing up after watching a movie, because the pain he experienced on October 30, 2008 was "a really painful, sharp pain."

Yoshii testified that after he felt the pain on October 30, he held on to the wall and could not move for two or three minutes. He then proceeded to the truck in which his wife was waiting to pick him up, and had a hard time lifting his leg to get into the truck. Yoshii testified that he then called his supervisor, Travis Kono, and security to tell them what had happened, and security told him to inform the human resources (HR) department. Yoshii called HR, but no one answered. He was only able to get in touch with someone in HR about one week later.

The same day as the incident, Yoshii went to the emergency room at Pali Momi. The emergency room staff iced Yoshii's leg, wrapped bandages around his calf and knee, and told him to stay off his feet. The emergency room report, prepared by Dr. Donald Wilcox, stated that Yoshii's chief complaint was a "sore muscle" and described the history of Yoshii's injury as follows:

> The patient has a sore right leg for about 4 to 5 days. He saw his doctor 4 days ago for this. He is not sure if he strained it or exactly what but it is sore. He was placed on a diuretic because of this. He states he is a short order cook so he is on his feet all the time. It just feels achy. It is achy on

5

> the lateral calf, not posteriorly and not behind the knee, and it feels a little achy up to the thigh. The foot feels a little sore and swollen too.

Dr. Wilcox noted that Yoshii's complaints "may just be due to progressive edema" and advised Yoshii to continue with the diuretic and to follow up with his doctor.

After the October 30, 2008 incident, Yoshii did not return to work for eight months.

**B.    Yoshii's filing of his worker's compensation claim and treatment after the October 30, 2008 injury**

On November 3, 2008, Yoshii saw Dr. Ragunton for a follow up. Dr. Ragunton's report for this visit stated: "Patient comes in for an ER follow up. He re-injured his calf on 10/30/08. . . . [H]e complains of continued pain to the right calf area. Evaluation in the emergency room revealed no significant pathology. The patient is concerned of possible muscle injury since he stands all day at work." Dr. Ragunton advised Yoshii to "keep his legs elevated as much as possible" and to remain off work.

On November 14, Yoshii returned to Dr. Ragunton, complaining that his "right leg is still sore." Dr. Ragunton advised Yoshii to continue taking furosemide tablets for swelling, limit his fluid intake to prevent further edema, and "remain off work until I reevaluate him in two weeks."

On November 18, 2008, Yoshii filed a "report of work-

related injury" with his employer.  Yoshii described the incident as occurring on October 30, 2008 in the following way:  "Walking down the loading dock stairway and I stepped on my right foot the wrong way hurting my right calf.  I had very sharp pain and couldn't move for about 2-3 minutes.  Then I had a very hard time getting into our vehicle."  Yoshii noted his injury as "right calf muscle strain."  The supervisor's section of the form was filled out by Travis Kono and stated that the "injury occurred after scheduled work hour [sic], outside of the kitchen walking down the stairs" and that Yoshii was not performing his work duties when the injury occurred because he was "off the clock."

On November 24, 2008, December 8, 2008, and December 22, 2008, Yoshii revisited Dr. Ragunton for follow up on his right leg pain.  At the December 22 visit, Dr. Ragunton referred Yoshii to Dr. Calvin Oishi for "possible torn meniscus of right knee."

On December 29, 2008, Dr. Oishi saw Yoshii and ordered an MRI, which showed "moderate knee effusion, moderate chondromalacia of the tibiofemoral joint, lateral patellofemoral joint as well as possible degenerative tear of the medial meniscus."  Yoshii had surgery on his knee on January 17, 2009, for repairs to both medial and lateral meniscus tears in his right knee.  Five months after surgery, Yoshii was referred to Dr. Alan Oki, a rheumatologist, who noted that since the surgery

Yoshii had shown "substantial improvement" but that he still had some "residual pain."  On June 24, 2009, Dr. Oki diagnosed Yoshii with "osteoarthritis of the right knee with chondromalacia involving the medial femoral condyle and patella" and noted that he "had both medial and lateral meniscus tears which were successfully addressed by Dr. Oishi."

On February 18, 2009, First Insurance sent a letter to the Director of the LIRAB (Director) stating that it had concluded that "Yoshii did not suffer an injury arising out of and in the course of employment with University of Hawaiʻi." The letter further stated:

> We base our denial of benefits on the [independent medical examination] by Brian Mihara, MD dated 2/9/09.[2]  Dr. Mihara indicates no evidence in the medical records to suggest that this was a work related trauma.  This was a pre-existing condition documented in the medical record dating back a number of years.

After First Insurance denied Yoshii's benefits, Yoshii filed a WC-5 "employee's claim for workers' compensation benefits" form with the Director.  On the form, Yoshii explained that the reason for the filing of the form was that "claimant had insurance deny [sic] claim."  Yoshii described the accident as: "walking down loading dock stair stepped on my right foot and felt sharp pain in my leg" and his injury as:  "torn ligament on right knee both inside and outside."

---

[2]     Dr. Mihara's report is discussed further below.

8

## C. Physicians' medical opinions regarding work-relatedness of Yoshii's injury

### 1. Dr. Ragunton

Four months after the incident, on March 30, 2009, Dr. Ragunton provided a medical statement regarding Yoshii's leg injury. Dr. Ragunton stated:

> Mr. Brian Yoshii was initially seen by me on October 27, 2008. This was 3 days prior to his injury at work. He had reported leg pain when getting off a chair. At that time it appeared that his leg pain was caused by leg swelling and fluid retention. The patient was treated with diuretic therapy.
>
> Mr. Yoshii was injured at work on October 30, 2008. He went to the emergency room and on November 3, 2008 I saw him for follow up. He reported that the emergency room evaluation revealed no significant pathology. I am not sure if the emergency room was advised that the patient hurt his knee at work. At that time was [sic] concerned that the patient still had a medical condition contributing to his knee and leg pain. At that time an evaluation was started by myself. It appeared that he had no evidence of deep venous thrombosis of his lower extremity. I obtained a CT scan of the right leg which revealed no phlebitis or clots. There was also no evidence of any muscular tear. His medications were adjusted and his symptoms of swelling and pain had improved. Upon further follow-up however the patient reports that his upper calf and knee still hurt. At that point I had referred him to Dr. Calvin Oishi for further evaluation. He was found to have a torn meniscus of the right knee. Since surgery was performed in [sic] the patient going through physical therapy, his symptoms of need [sic] and calf pain have improved.
>
> Because of his initial presentation being unclear, I did not pursue a work related claim upon initial presentation. However the patient feels certain that his knee pain and subsequent torn meniscus was related to the injury at work on October 27, 2008. I am in agreement with this because the patient had no significant problems with his knee until after his injury. I also excluded and treated medical causes for pain and swelling of his right knee.

Dr. Ragunton also completed a WC-2 "physician's report" on March 30, 2009 describing Yoshii's October 30, 2008 accident, stating that Yoshii's injury occurred on October 30, 2008, and that the accident was not the only cause of Yoshii's injury because "initially I thought [Yoshii's] condition may be related to arthritis or swelling caused by medication or even deep vein thrombosis but after treating these conditions pain in R[ight] knee and calf persisted." Dr. Ragunton's "final diagnosis" on this form was that Yoshii had a "torn meniscus of right knee."

## 2. Dr. Oishi

In a letter addressed to Yoshii's attorney dated March 5, 2010, Dr. Oishi stated that Yoshii first presented to him on December 29, 2008 complaining of persistent knee pain. Dr. Oishi obtained an MRI and then performed surgery to conduct a "partial medial and lateral meniscectomy, as well as an arthroscopic lateral release with chondromalacia patella." Regarding the work-relatedness of Yoshii's injuries, and his disability from work, Dr. Oishi stated:

> The meniscus tear may have been caused by an injury at work but the chondromalacia probably was not. I really have no opinion regarding whether the patient suffered an injury at work as it wasn't reported to me as such. But if I review the records it would seem that the time line would be that he had pain after injury. At least according to Dr. Ragunton's note.
>
> Usually after arthroscopic surgery the patient would be totally disabled for a month and then partially disabled therefore [sic]. So for treatment you would have to assume patient was totally disabled from 1/17/09 to 2/17/09 and then from 2/17/09 to 8/27/09

10

the patient was partially disabled.  That would be the treatment period for treatment of his knee.

### 3.    Dr. Mihara

Dr. Mihara examined Yoshii on February 9, 2009 at the request of First Insurance.  After recounting Yoshii's medical history, Dr. Mihara stated:

> 2.    The Claimant's diagnoses are:
>
> a.    Right calf and lower extremity discomfort, primarily radicular in nature and not related to any work related incident on 10/30/08.  This preexisted the alleged 10/30/08 incident and the medical record does not suggest that there was a work related injury or aggravation.
>
> b.    History of recent right knee arthroscopic surgery performed by Dr. Calvin Oishi, reportedly for meniscal tears of the right knee.  The medical record does not suggest that a meniscal tear or knee joint injury occurred on 10/30/08 at work.
>
> c.    History of preexisting mild lower back pain and occasional right and left lower extremity radicular-type complaints historically attributed to tendonitis and muscular pain.  This may indicate a nerve root problem, possibly from his back or even a nerve problem related to diabetes.
>
> d.    History of preexisting right lower extremity edema, etiology unclear. Scanning of the right lower extremity has not revealed a source for the right lower extremity swelling.  This swelling may be contributing partially to his leg complaints.
>
> The prognosis for the right calf pain and radicular complaints is guarded, given the likelihood that this may well be degenerative in nature or related to his diabetes.  Either way, this is not typically associated with "quick fix" treatment options.
>
> 3.    It is my opinion that the claimant's pain experienced on 10/30/08 was likely radicular in origin.  This was a preexisting condition documented in the medical record dating back a number of years.  It had been more frequent in

11

> recent years and in particular, it flared up just several days prior to 10/30/08 after the claimant stood up watching a movie. This suggests the possibility of a nerve root irritation. The medical record available to me does not suggest any work related link, and the medical record does not indicate any gastrocnemius tear or meniscal tear due to work injury. In other words, I can find no evidence in the medical record to suggest that this was a work related trauma or problem. I am forced to rely on the medical record, given the inconsistencies in the claimant's verbal history.

### 4. Dr. Davenport

At the request of First Insurance, Dr. Kent Davenport examined Yoshii on June 4, 2009. Dr. Davenport noted his impression as "[p]robable right calf strain unrelated to work injury of 10/30/08." Dr. Davenport then stated:

> Brian Yoshii clearly injured his right calf on 10/27/08 while rising from a chair after watching a movie. He was seen in the emergency room on 10/30/08 with increasing right calf pain. However, I do not believe that there is an injury on 10/30/08 but merely the continuation of Mr. Yoshii's right lower extremity discomfort.
>
> It would be difficult to give Mr. Yoshii a diagnosis at this time as all of his calf discomfort seems to have cleared. He does have some radiating pain in his thigh which could suggest a back injury. It was also noted that he was referred to Calvin Oishi, M.D., orthopedic surgeon, for evaluation of a possible meniscus tear. However, it is clear from the medical records that this condition began on 10/27/08. I do not believe that it was aggravated or accelerated on 10/30/08.

## D. The Director's May 13, 2010 Decision

The Director held a hearing on March 23, 2010 on the issues of the compensability of Yoshii's knee injury, the periods through which Yoshii was eligible for temporary total disability

12

(TTD) benefits, and whether to strike certain certifications and reports because they were untimely.[3]

The Director found that Yoshii's right knee injury was compensable.  In coming to this conclusion, the Director credited Yoshii's WC-5 form and Dr. Ragunton's March 30, 2009 report and WC-2 form.  The Director then ordered the State to "pay for such medical care, services and supplies as the nature of the injury may require" and "pay to claimant weekly compensation of $527.26 for [TTD] from work . . . for 24.4286 weeks, for a total of $12,880.21."

E.   **Dr. Morris Mitsunaga's medical opinion**

After the Director issued the decision, Yoshii obtained a medical report from Dr. Morris Mitsunaga on February 14, 2011. Dr. Mitsunaga's impression of Yoshii's injury was "[b]ilateral knee osteoarthritis with chondromalacia."  Dr. Mitsunaga prefaced his conclusions by stating:  "Please note that the conclusions made were from the interview of the patient, and the records received.  I did not have the operative report of Dr. Oishi on the right knee nor the MRI report of his right knee."

---

[3]     The Director struck Dr. Oishi's March 3, 2013 report and Dr. Davenport's June 4, 2009 report from the record because they were untimely submitted.  However, on appeal to the LIRAB, these reports were part of the record.  The LIRAB credited Dr. Davenport's opinion and then determined that the issue of whether to strike his report was moot.  Even considering Dr. Davenport's report, it does not provide the substantial evidence necessary to enable the State to overcome the presumption that Yoshii's work injury was compensable.

Dr. Mitsunaga then concluded:

> It is my opinion that the patient suffers from osteoarthritis of both knees and chondromalacia patella.  The incident of 10/30/08 aggravated a preexisting condition.  There was not a specific injury.  He was walking down stairs and had the sudden onset of right knee pain.
>
> It is my opinion that the patient has osteoarthritis and it was aggravated by his work activities as described.  He states at work he has to stand constantly, walks back and forth, and goes up and down stairs and lifts things.  He has progressive pain with kneeling and squatting which would be consistent with his symptoms of chondromalacia.
>
> . . . .
>
> It is my opinion that the patient had preexisting osteoarthritis and chondromalacia of both knees that was aggravated by his excessive work activities.  His so-called sudden onset when coming down stairs at work on 10/30/08 aggravated his preexisting problems.

## F.    Appeal to the LIRAB

On May 19, 2010, Yoshii filed an appeal with the LIRAB. In his initial conference statement to the LIRAB, the only issue Yoshii raised was whether he was entitled to TTD benefits for the periods October 30, 2008 through January 5, 2009 and June 25, 2009 through July 22, 2009.  The State, in its initial conference statement, raised the issue of "[w]hether [Yoshii] suffered a compensable injury arising out of and in the course of his employment on October 30, 2008."  On July 26, 2010, Yoshii withdrew his appeal, and on October 5, 2010, the LIRAB entered an order dismissing Yoshii's appeal and designating the State as the appellant.

On May 11, 2011, the LIRAB held a hearing at which

14

Yoshii was the only witness to testify.

In addition to the description of events of October 30, 2008 discussed above, Yoshii testified that nothing else happened to his right knee between October 30, 2008 and December 29, 2008, when he had the MRI that showed a torn meniscus in his right knee.

On cross-examination, Yoshii testified that when he hurt his knee on October 30, 2008, he was already "off the clock" for the day and that he was not in his assigned work area because he was going to his personal vehicle.  Yoshii also acknowledged that he did not initially tell his physician about filing a workers' compensation claim but that he changed his mind later when he filed his WC-5 form.

Yoshii also testified that when he visited the emergency room on October 30, 2008, Dr. Wilcox did not examine his knee, but told him to stay off his feet and do a follow-up visit with Dr. Ragunton.  However, Yoshii also testified that he could not recall the exam given by Dr. Wilcox, he did not know what it meant that Dr. Wilcox identified edema in Yoshii's knees, and he was not aware of Dr. Wilcox's diagnosis.

Yoshii also testified that when he was referred to Dr. Oishi, he told Dr. Oishi that he had suffered a knee injury as part of a workers' compensation injury, but that he did not know that Dr. Oishi had stated in his report that he had no

opinion regarding whether the injury was suffered at work because "it wasn't reported to me as such." Yoshii also testified that when he went to see Dr. Oishi, he noticed that there was a sign on the wall stating that Dr. Oishi "wasn't accepting Workmen's Compensation at the time."

Yoshii acknowledged that in Dr. Oki's report dated June 24, 2009, Dr. Oki stated that Yoshii had a "three-year history of right knee pain," but could not remember whether he had told Dr. Oki that. Yoshii also acknowledged that Dr. Oki's report stated that Yoshii "denies specific trauma or strain," and that he had told Dr. Oki that he had not suffered a traumatic injury.

Yoshii further stated that when Dr. Oishi received the MRI films, he explained to Yoshii what they showed and told him that he "had a torn meniscus on the inside and outside of [his] right knee." He could not recall Dr. Oishi telling him that it was a possible degenerative tear.

On re-direct examination, Yoshii testified that his injury on October 30, 2008 was not the same as the one he suffered on October 26, 2008, for which he saw Dr. Ragunton on October 27, 2008, because "[a]t the movie theater [on October 26], it seemed like a muscle. A pulled muscle or something in my calf. And on the day of the injury, it was really sharp and it was really sore. In fact, I screamed[.]"

When questioned by the LIRAB board members, Yoshii indicated that when he felt the pain at the movie theater on October 26, 2008, it was located below the big part of his knee, at the top of his calf muscle, and the pain he felt on October 30, 2008 was in "[t]he same area."  When asked whether the pain on October 30, 2008 extended in to the "big part of your leg where your knee bends," Yoshii stated,  "[w]ell, to tell you the truth . . . I felt it was like my calf.  Because that's what was bothering me earlier and that's what I went to see the doctor for."

On March 21, 2012, the LIRAB issued its decision and order.  The LIRAB made the following findings of fact (FOFs):

> 1.  On October 30, 2008, Claimant BRIAN M. YOSHII ("Claimant") was a [sic] employed as a Cook II at [LCC] for Employer.
>
> 2.  In a WC-5 . . . filed on March 11, 2009, Claimant alleges that on October 30, 2008 at approximately 3:20 p.m., he injured his right knee while walking down the loading dock stairs.  He described his injury as a torn ligament.
> Employer denied liability for a work injury.
>
> 3.  In a November 18, 2008 Report of Work-Related Injury/Illness[,] Claimant stated that work his [sic] day began at 6:00 a.m. and ended at 2:30 p.m.  He explained that he stepped on his right foot the wrong way and hurt his right calf.  He identified his injury as a right calf muscle strain.
> The Supervisor's Statement by Travis T. Kono noted that Claimant was "off the clock" and that the "[i]njury occurred after scheduled work hours, outside of the kitchen walking down the stairs."  Mr. Kono noted that Claimant had been "out on sick leave on similar injury prior to incedent [sic]."
>
> . . . .
>
> 6.  Claimant saw Dr. Ragunton on November 3, 2008 and stated that he re-injured his calf on October

17

30, 2008. Claimant was concerned about a possible muscle injury since he stood all day at work. Dr. Ragunton suspected that Claimant may have had a muscle tear.

. . . .

8. On February 9, 2009, Brian Y. Mihara, M.D., an occupational medicine physician, examined Claimant at Employer's request. Claimant informed Dr. Mihara that he never had calf pain or right lower pain [sic] before October 30, 2008. Dr. Mihara noted, however, that Claimant's medical records documented a history of prior lower extremity symptoms, both right and left, from the hips through the knees and into the feet and ankles.

Dr. Mihara opined that Claimant's right calf and lower extremity discomfort was primarily radicular in nature and pre-existed the October 30, 2008 incident. He noted that the medical record neither suggested a work related injury or aggravation nor a meniscal tear or knee joint injury that occurred at work on October 30, 2008. Dr. Mihara noted an incident on October 27, 2008, where Claimant experienced right leg symptoms when standing up after watching a movie.

. . . .

10. Kent Davenport, M.D., an orthopedic surgeon, conducted a medical records review. In his report dated June 4, 2009, Dr. Davenport opined that Claimant sustained "[p]robable right calf strain unrelated to work injury of 10/30/2008." Dr. Davenport opined that Claimant's leg condition was a continuation of his right extremity discomfort that he experienced on October 27, 2008, while arising from a chair after watching a movie. Dr. Davenport did not believe that the condition was aggravated or accelerated on October 30, 2008.

. . . .

12. Dr. Oishi, an orthopedic surgeon, prepared a report dated March 5, 2010, which noted his opinion that the "meniscus tear may have been caused by an injury at work but the chondromalacia probably was not." He stated that he had no opinion whether Claimant sustained an injury at work because it was not reported to him as such.

. . . .

14. Morris M. Mitsunaga, M.D., an orthopedic surgeon, prepared a report dated February 14, 2011, wherein he noted that Claimant did not remember twisting his knee or mis-stepping on October 30, 2008. Claimant also related that his pain was in his calf,

18

not his knee. Claimant complained to Dr. Mitsunaga, however, of continued right knee pain.

Claimant informed Dr. Mitsunaga that similar symptoms on his left side were considered not work-related by Dr. Scott McCaffrey, M.D.

Dr. Mitsunaga opined that Claimant had bilateral knee osteoarthritis with chondromalacia patella and that the October 30, 2008 incident aggravated that condition, although there was not a specific injury. Dr. Mitsunaga also opined that Claimant's osteoarthritis was aggravated by his work activities of constant standing, walking back and forth, going up and down stairs, and lifting things.

15. The Board finds Claimant's testimony to be inconsistent in describing his alleged injury and with medical and other records; therefore, Claimant's testimony is not credited.

16. The Board credits the opinions of Drs. Mihara and Davenport over those of Drs. Ragunton and Mitsunaga.

The Board specifically declines to credit Dr. Ragunton's opinion regarding causation and the description of the injury which are inconsistent with the medical records, including Dr. Ragunton's own medical records.

Further, Dr. Oishi provided an equivocal comment that he had no opinion regarding causation.

17. The Board finds that the pain Claimant experienced on October 30, 2008 was related to the edema that he experienced on October 26, 2008, for which he took time off from work for several days and sought treatment with Dr. Ragunton on October 27, 2008.

Claimant specifically noted that his pain symptoms continued from the movie incident and were located in his calf, rather than his knee, even for many weeks after the movie incident and the alleged work injury. On November 24, 2008, Claimant informed Dr. Ragunton that his right lower extremity pain had improved. As of that date, there was no evidence of any complaints about Claimant's knee.

18. There is no evidence of torn ligaments as described or claimed by Claimant.

19. The Board has applied the presumption of compensability and finds that Employer has presented substantial evidence to overcome and rebut said presumption with regard to Claimant's knee condition.

The LIRAB then made the following relevant conclusion

of law (COL):

19

> 1. Having applied the presumption of compensability and determining that Employer presented substantial evidence to overcome and rebut the presumption, the Board concludes that Claimant did not sustain a personal injury to his right knee on October 30, 2008, arising out of and in the course of employment.

The LIRAB thus reversed the Director's May 13, 2010 decision.

## G.    Appeal to the ICA

In his appeal to the ICA, Yoshii argued that the LIRAB erred in concluding that the State had overcome the presumption of coverage pursuant to HRS § 386-85 because the medical opinions given by the State's doctors, Dr. Davenport and Dr. Mihara, were generalized opinions that merely concluded that Yoshii's knee injury was not work-related, and did not explain why the incident on October 30, 2008 could not have caused a meniscus tear or aggravated an exiting tear, or explain what might have caused the tear.  Yoshii also argued that even if the State did adduce substantial evidence to overcome the presumption of coverage, the evidence did not outweigh the medical evidence adduced by Yoshii showing that the injury was a compensable work injury.  Yoshii thus argued that the LIRAB erred in giving the State's evidence more weight.

The State argued that the seven pieces of evidence listed below amounted to substantial evidence sufficient to rebut the presumption:

20

1.    Dr. Ragunton's October 27, 2008 report showing
      that Yoshii complained of right leg pain before
      the date of his claimed injury after getting up
      from a chair at the movie theater.

2.    Dr. Ragunton's statement in his March 30, 2009
      letter that "the patient feels certain that his
      knee pain and subsequent torn meniscus was
      related to the injury at work on October 27
      [sic], 2008."

3.    Dr. Oishi's statement in his March 5, 2010
      report that "I really have no opinion regarding
      whether the Claimant suffered an injury at work
      as it wasn't reported to me as such."

4.    Statements in Dr. Mihara's February 9, 2009
      report connecting Yoshii's leg pain to
      "radicular symptomatology" and Yoshii's
      statements to Dr. Mihara that when he was
      walking down the stairs on October 30, 2008, he
      felt pain in his "calf."

5.    Dr. Mihara's opinion that "[t]he medical record
      does not suggest that the meniscal tear of knee
      joint injury occurred on 10/30/08 at work."

6.    Dr. Davenport's opinion in his June 4, 2009
      report that "it was clear from the medical
      records that this condition began on 10/27/08.
      I do not believe that it was aggravated or
      accelerated on 10/30/08."

7.    The fact that Yoshii's right knee MRI and
      surgery were not obtained in a manner consistent
      with the Worker's Compensation Medical Fee
      Schedule because there was no consultation
      treatment request, concurrent treatment request,
      or surgical treatment request submitted.

The State further argued that the opinions of doctors Mihara and Davenport are not generalized opinions because both address the underlying facts before concluding that Yoshii's knee injury was not work-related. Finally, the State argued that the evidence it adduced outweighed Yoshii's evidence.

On April 24, 2015, the ICA entered its memorandum opinion affirming the LIRAB's decision and order. The ICA

21

majority first addressed Yoshii's argument that the LIRAB should have concluded that, based on Dr. Mitsunaga's opinion, "the nature of the injury included the aggravation to the degenerative condition and the tear in [Yoshii's] right knee from [Yoshii's] work activities" and "the progression of the arthritis and the effect of the work activities on the knee caused the tear of the posterior horn of the lateral meniscus that in turn required the surgery." The ICA majority declined to rule on the merits of this argument because, according to the majority, Yoshii's claim for a covered injury "was not based on cumulative injury stemming from work activity, but upon the stair-stepping event occurring on October 30, 2008."

In regard to whether the LIRAB erred in concluding that the State had submitted substantial evidence sufficient to overcome the presumption of coverage, the ICA majority agreed that the presumption applied, but held that the LIRAB did not err in finding that the State had adduced substantial evidence and had overcome the presumption. The ICA majority reasoned that Yoshii initially complained of pain in his right calf, and that neither of the incidents that Yoshii alleged had caused his pain--getting out of his seat on October 27, 2008, and walking down the stairs on October 30, 2008--occurred "while performing his work duties or during office hours." The ICA also noted that until December 29, 2008, when Yoshii first saw Dr. Oishi, there

was no indication that Yoshii was experiencing knee pain or that there was any problem with his knee.

The ICA also relied upon the report of Dr. Mihara, which stated that in his opinion, Yoshii's knee injury was not due to any work injury. Based on this evidence, the ICA then concluded that the LIRAB had not erred in finding that the State had overcome the presumption of coverage.

Judge Lisa Ginoza filed a dissenting opinion disagreeing with the majority's conclusion that the State had adduced substantial evidence sufficient to overcome the presumption. Judge Ginoza reasoned that it was undisputed that Yoshii felt pain in his right leg on October 30, 2008 and immediately sought care in the emergency room at Pali Momi, and then within two months was diagnosed with a possible torn meniscus in his right knee. Judge Ginoza concluded that the reports of Drs. Mihara and Davenport, which were relied upon by the LIRAB, did not constitute substantial evidence because they lacked explanation "with a reasonable degree of specificity" of why the October 30, 2008 injury could not have been at least an aggravating factor of Yoshii's meniscus tear.

On August 3, 2015, Yoshii timely filed his application for writ of certiorari. Yoshii presents one question for this court:

> Whether the ICA gravely erred by not properly applying
> the presumption that Clamant [sic] had a work injury

23

to his right leg, including a complex tear of the
medial meniscus and a complex tear of the lateral
meniscus?

## III. Standards of Review

## A. The LIRAB's Decision

The standard of review for LIRAB decisions is well-established:

> Appellate review of a LIRAB decision is governed by HRS § 91-14(g) (1993), which states that:
>
> > Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
> >
> > > (1) In violation of constitutional or statutory provisions; or
> > > (2) In excess of the statutory authority or jurisdiction of the agency; or
> > > (3) Made upon unlawful procedure; or
> > > (4) Affected by other error of law; or
> > > (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
> > > (6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
>
> We have previously stated:
>
> [FOFs] are reviewable under the clearly erroneous standard to determine if the agency decision was clearly erroneous in view of reliable, probative, and substantial evidence on the whole record.
>
> [COLs] are freely reviewable to determine if the agency's decision was in violation of constitutional or statutory provisions, in excess of statutory authority or jurisdiction of agency, or affected by other error of law.
>
> A COL that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the conclusion is dependent upon the facts and circumstances of the particular case. When mixed questions of law and fact are presented, an appellate court must give deference to the agency's expertise and experience in the particular field. The court should not substitute its own judgment for that of the agency.

24

Igawa v. Koa House Rest., 97 Hawai'i 402, 405-06, 38 P.3d 570, 573-74 (2001) (internal quotation marks and citations omitted; alterations in original) (quoting In re Water Use Permit Applications, 94 Hawai'i 97, 119, 9 P.3d 409, 431 (2000)).

> An FOF or a mixed determination of law and fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding or determination, or (2) despite substantial evidence to support the finding or determination, the appellate court is left with the definite and firm conviction that a mistake has been made. We have defined "substantial evidence" as credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.

In re Water Use Permit Applications, 94 Hawai'i at 119, 9 P.3d at 431 (internal quotation marks and citations omitted).

### IV. Discussion

Yoshii argues that the ICA erred in concluding that the State adduced substantial evidence sufficient to overcome the presumption of coverage.[4] For the reasons set forth below, we agree with Yoshii.

**A. The LIRAB erred in finding that the State adduced substantial evidence sufficient to overcome the presumption of coverage**

Yoshii argues that neither of the two medical opinions proffered by the State provided the substantial evidence necessary to overcome the presumption of coverage because they

---

[4] Yoshii also argues that the ICA erred in concluding that the time and location of his alleged injury barred his claim. However, it appears that neither the LIRAB nor the ICA relied on the time and location of the injury in determining that the State adduced substantial evidence to overcome the presumption of coverage. Thus, we do not address this argument here.

25

are generalized, meaning "they do not identify factual events that would corroborate their opinion."  Specifically, Yoshii asserts that neither Dr. Davenport nor Dr. Mihara gave "specific explanations for the cause of the tear [in Yoshii's knee] and the chondromalacia" or "address[ed] whether the stepping down of [sic] the stairs could have aggravated any pre-existing osteo-arthritis to cause the tear or aggravate a lesser, pre-existing tear."

HRS § 386-85 provides, in pertinent part, that "[i]n any proceeding for the enforcement of a claim for compensation under this chapter it shall be presumed, in the absence of substantial evidence to the contrary:  (1) That the claim is for a covered work injury."  This court has stated:

> When determining whether a workers' compensation claim is work-related, it is well established in Hawaiʻi that it shall be presumed, in the absence of substantial evidence to the contrary . . . that the claim is for a covered work injury.  As indicated in Acoustic, Insulation & Drywall, Inc. v. Labor and Industrial Relations Appeal Board, 51 Haw. 312, 316, 459 P.2d 541, 544 (1969), to rebut the presumption, the employer has the burden of going forward with the evidence, which is the burden of production, as well as the burden of persuasion.  The burden of production means that the employer must initially introduce substantial evidence that, if true, could rebut the presumption that the injury is work-related.  In evaluating whether the burden of producing substantial evidence has been met, the slightest aggravation or acceleration of an injury by the employment activity mandates compensation.
>
> In evaluating whether the burden of persuasion has been met in the workers' compensation context, the broad humanitarian purpose of the workers' compensation statute read as a whole requires that all reasonable doubts be resolved in favor of the claimant.  In this case, the employer failed to meet its initial burden of producing substantial evidence,

26

> and we therefore do not reach the burden of persuasion.
>
> As this court explained in Van Ness, this is a high burden placed on the employer, which is necessary because of the purpose of Hawaii's workers' compensation law:
>
> The legislature has decided that work injuries are among the costs of production which industry is required to bear. Workmen's compensation laws were enacted as a humanitarian measure, to create legal liability without relation to fault. They represent a socially enforced bargain: the employee giving up his right to recover common law damages from the employer in exchange for the certainty of a statutory award for all work-connected injuries.

Panoke, 136 Hawaiʻi at 461-62, 363 P.3d at 309-10 (internal citations, formatting, and punctuation omitted).

There is no dispute that Yoshii's claim for compensation triggered the HRS § 386-85 presumption. As in Panoke, the threshold question in this case is whether the State adduced substantial evidence to overcome the presumption. See id. at 461-62, 363 P.3d at 309-10.

"[A] reasonable degree of specificity is required in order for medical opinion evidence to rebut the presumption of compensability." Id. at 462, 363 P.3d at 310 (citation omitted). Moreover, "the slightest aggravation or acceleration of an injury by the employment activity mandates compensation." Van Ness v. State, 131 Hawaiʻi 545, 562, 319 P.3d 464, 481 (2014) (citing DeFries v. Ass'n of Owners, 999 Wilder, 57 Haw. 296, 309, 555 P.2d 855, 862 (1976)).

In the present case, the only medical evidence the State presented to rebut the presumption was the reports of

27

Dr. Mihara and Dr. Davenport.  Those reports are conclusory in nature and do not provide substantial evidence sufficient to overcome the presumption of coverage.

Dr. Mihara's report stated that Yoshii's discomfort in his right leg "preexisted the alleged 10/30/08 incident and the medical record does not suggest that there was a work related injury or aggravation."  Dr. Mihara stated that the pain Yoshii suffered on October 30, 2008 was the result of a pre-existing condition connected to the pain he felt a few days earlier when he stood up after watching a movie.  Regarding the possibility that the October 30, 2008 incident may have caused or aggravated Yoshii's meniscal tear, Dr. Mihara stated only that "the medical record does not indicate any gastrocnemius tear or meniscal tear due to work injury."  Dr. Mihara did not explain this statement any further.  The report does not explain, for example, why walking down the stairs on October 30, 2008 could not have caused a meniscal tear, nor does it explain why the pain Yoshii experienced a few days prior to October 30, 2008 could not have been the result of a meniscal tear that was further aggravated as Yoshii descended the stairs at LCC on October 30, 2008.

Dr. Davenport's report is also conclusory.  Dr. Davenport's report stated, "I do not believe that there is an injury on 10/30/08 but merely the continuation of Mr. Yoshii's right lower extremity discomfort."  Dr. Davenport then stated

28

that "[i]t was also noted that [Yoshii] was referred to Calvin Oishi, M.D., orthopedic surgeon, for evaluation of a possible meniscus tear.  However, it is clear from the medical records that this condition began on 10/27/08.  I do not believe that it was aggravated or accelerated on 10/30/08."  Thus, Dr. Davenport seemed to recognize that the injury Yoshii saw Dr. Ragunton about on October 27, 2008 was indeed connected to the meniscus tear for which Yoshii later saw Dr. Oishi in December.  Nevertheless, Dr. Davenport stated that Yoshii's injury was neither aggravated nor accelerated three days later on October 30, 2008 when Yoshii again hurt his leg on the stairs, and gave no explanation as to why he arrived at that conclusion.

Moreover, Dr. Davenport examined Yoshii on June 4, 2009, and stated that "[i]t would be difficult to give Mr. Yoshii a diagnosis at this time as all of his calf discomfort seems to have cleared."  Yoshii underwent surgery on January 17, 2009 to repair his torn meniscus and Dr. Davenport does not give any medical opinion as to why, if Yoshii's calf pain was not connected to his meniscus tear, Yoshii's pain would have subsided after he underwent his knee surgery.

In sum, the medical reports relied upon by the State do not provide any "reasonable degree of specificity" in explaining why Yoshii's knee injury was not caused or aggravated by the incident on October 30, 2008.  Like the employer's medical

testimony in <u>Panoke</u>, the reports of Dr. Mihara and Dr. Davenport do not discuss how the symptoms that Yoshii experienced before and after the claimed work injury demonstrate that the October 30, 2008 incident did not cause his torn meniscus. As such, they do not constitute substantial evidence and do not rebut the presumption that Yoshii's injury is a covered work injury. See <u>Panoke</u>, 136 Hawaiʻi at 463-64, 363 P.3d at 311-12.

The other evidence relied upon by the State also does not constitute substantial evidence. The State relies on both Dr. Ragunton's October 27, 2008 report showing that Yoshii complained of right leg pain before the date of his claimed injury after getting up from a chair at the movie theater and Dr. Ragunton's statement in his March 30, 2009 letter that "the patient feels certain that his knee pain and subsequent torn meniscus was related to the injury at work on October 27, 2008 [sic]." However, the fact that Yoshii first hurt his leg a few days before the date of his claimed work injury does not mean his work injury is not covered. There was still no substantial evidence adduced to rebut the presumption of coverage.

Second, the State also relies upon Dr. Oishi's statement in his March 5, 2010 report that "I really have no opinion regarding whether the Claimant suffered an injury at work as it wasn't reported to me as such." However, Dr. Oishi's lack of an opinion regarding the work-relatedness of Yoshii's injury

does not constitute substantial evidence to show that it was not caused by Yoshii's work. Dr. Oishi only stated that he could not make a conclusion one way or the other because Yoshii had not reported it to him as a work injury.

As in Panoke, the State's physicians did not do more than "opine generally" that Yoshii's injury predated the work incident, and "the physicians did not consider how [Yoshii]'s prior injury might have been affected or aggravated[.]" 136 Hawaiʻi at 464, 363 P.3d at 312. Thus, "the medical reports of the employer's physicians do not provide a sufficient degree of specificity to constitute substantial evidence to rebut the presumption that [Yoshii's] injuries were work-related." Id. at 461, 363 P.3d at 309.

As Judge Ginoza noted in her dissent, there is no conclusive evidence showing whether Yoshii's torn meniscus in his right knee was the cause of the pain Yoshii experienced as he descended the stairs on October 30, 2008, or whether, as the State argues, the pain Yoshii experienced on October 27 and October 30 of 2008 was the result of a pre-existing injury completely separate from the torn meniscus. However, the State's failure to present substantial evidence to overcome the presumption means that we do not need to weigh the competing evidence. Id. at 462, 363 P.3d at 310. Thus, the LIRAB erred when it concluded that Yoshii's injury was non-compensable

31

because it did not arise out of and in the course of his employment.

## V.  Conclusion

For the foregoing reasons, we hold that the LIRAB erred in concluding that the State had adduced substantial evidence sufficient to rebut the presumption that Yoshii's knee injury was a compensable work injury.  We thus vacate the ICA's June 4, 2015 judgment and the LIRAB's March 21, 2012 decision and order, and remand to the LIRAB for further proceedings consistent with this opinion.

Herbert R. Takahashi
and Rebecca L. Covert
for petitioner

Paul A. Brooke
for respondents

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Sabrina S. McKenna

/s/ Richard W. Pollack

/s/ Michael D. Wilson

